WINDSURFING INTERNATIONAL, INC., Plaintiff,

and James R. Drake, Intervenor-Plaintiff,

v.

FRED OSTERMANN GmbH, et al., Defendants.

AMF INCORPORATED, Plaintiff,

v.

WINDSURFING INTERNATIONAL, INC., Defendant,

and

James R. Drake, Intervenor-Defendant.

BIC LEISURE PRODUCTS, INC. and Windglider Fred Ostermann, GmbH, Plaintiffs,

v.

WINDSURFING INTERNATIONAL, INC., Defendant,

and

James R. Drake, Intervenor-Defendant.

James R. DRAKE, Cross-Claimant,

v.

WINDSURFING INTERNATIONAL, INC., Cross-Defendant.

Nos. 81 Civ. 254 (MEL), 83 Civ. 1691 (MEL), 83 Civ. 3774 (MEL).

United States District Court, S.D. New York.

Aug. 21, 1987.

Pennie & Edmonds, New York City for BIC Leisure Products, Inc.; Jonathan A. Marshall, Brian M. Poissant, of counsel.

Harold E. Wurst, Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst, Los Angeles, Cal., for Windsurfing Intern., Inc.; Michael J. Sweedler, Beverly Goodwin, Darby & Darby, New York City, of counsel.

LASKER, District Judge.

In the liability phase of this patent suit involving windsurfing boards, all of the claims of Windsurfing International Inc.'s U.S. Patent Re. 31,167 ("WSI reissue patent") were found to be valid. BIC Leisure Products, Inc. ("BIC Leisure")[1] was found to have infringed the WSI reissue patent,[2] *see Windsurfing International, Inc. v. Fred Ostermann GMBH*, 613 F.Supp. 933 (S.D.N.Y.1985) (*"Windsurfing I"*), *aff'd in relevant part, rev'd in part, vacated in part and remanded sub nom Windsurfing International, Inc. v. AMF, Inc.*, 782 F.2d 995 (Fed.Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986),[3] and was subsequently enjoined from any further infringement of the patent.[4] WSI now seeks enhanced damages and attorney fees from Bic under 35 U.S.C. §§ 284–285 (1982). After a three-day trial on these damage issues, during which six witnesses testified and numerous documents were received, it is determined that WSI has not established that BIC Leisure's infringement of the WSI reissue patent was willful, and, accordingly, neither enhanced damages nor attorney fees are awarded to WSI.

**Enhanced Damages**

 35 U.S.C. § 284 (1982) provides that in a patent action "the court may increase … damages up to three times the amount found or assessed." Enhancement of damages under § 284 must be premised on a finding of either willful infringement or bad faith. *Yarway Corp. v. Eur-Control USA, Inc.*, 775 F.2d 268, 277 (Fed.Cir. 1985). Here, WSI—which does not allege bad faith—has the burden of proof to show by clear and convincing evidence willful infringement on BIC Leisure's part. *See Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613, 628 (Fed.Cir.), *cert. dismissed*, 474 U.S. 976, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985).

A determination of willful infringement depends on the totality of the circumstances. Important factors to be considered include 1) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; 2) whether the infringer deliberately copied the ideas or design of another; and 3) the infringer's behavior as a party to the litigation. *See Bott v. Four Star Corp.*, 807 F.2d 1567, 1572 (Fed.Cir.1986).

**I. *BIC Leisure's Good Faith Belief on the Invalidity of the WSI Reissue Patent***

Where a potential infringer has actual notice of another's patent rights, he has an affirmative duty to exercise due care to determine whether or not he is infringing. *Bott*, 807 F.2d at 1572; *Underwater Devices Inc. v. Morrison-Knudsen Co.*, 717

---

1. The Bich family controls or is associated with a number of businesses, many of which bear the name "BIC" or "Bic". BIC Leisure Products, Inc., now known as BIC Sport USA, Inc., is a Connecticut corporation which was incorporated in November, 1981. Other BIC business concerns relevant to this decision include BIC Corporation, a New York corporation which owns all the issued and outstanding shares of BIC Leisure, and Societe Bic S.A., a French corporation which owns approximately 60% of the issued and outstanding common shares of BIC Corporation. *See* Joint Pretrial Order Regarding Trial on the Issues of Enhanced Damages

and Attorneys Fees ("Joint Pretrial Order") at ¶¶ I.A. 1–3.

2. The sailboards of AMF, Inc. and Downwind Corp. were also found to have infringed on the WSI reissue patent. These two sailboard manufacturers are not involved in the present damage proceeding.

3. Familiarity with these two opinions is assumed.

4. *See Bic Leisure Products, Inc. v. Windsurfing International, Inc.*, 83 Civ. 3774 (MEL), Judgment at ¶ 3 (S.D.N.Y. Sept. 11, 1985).

F.2d 1380, 1389 (Fed.Cir.1983). To meet this duty, the potential infringer must investigate the scope of the patent and form a good-faith belief that it is invalid or that it is not infringed. *Bott*, 807 F.2d at 1572. Here, it is clear that BIC Leisure did have notice of WSI's patent rights, and hence it must be determined whether BIC Leisure had a good-faith belief that the WSI patent was invalid.

### 1) *BIC Leisure's Notice of WSI's Patent Rights*

The BIC businesses first entered the sailboard market in the late 1970s when Tabur Marine, S.A. ("Tabur Marine"), a French corporation then owned by Marcel Bich, founder of Societe Bic, began to manufacture sailboards.[5] Around the same time, Dufour, Inc. ("Dufour"), a Delaware corporation owned by Tabur Marine,[6] began to sell in the United States the Tabur Marine sailboards made in France. In addition, Tabur Marine Ltd. ("Tabur UK"), a British corporation, sold Tabur Marine sailboards in Britain.[7] BIC Leisure was incorporated in November, 1981, and, when Dufour was dissolved in March, 1982, BIC Leisure assumed Dufour's sailboard business and continued to sell Tabur Marine sailboards in the United States.[8]

There is no question that BIC Leisure had actual notice of WSI's United States patent when it began selling sailboards in 1981.[9] Bruno Bich, Chief Executive Officer of BIC Corporation and President of BIC Leisure, testified that he became aware of "a question of a patent" owned

by WSI in the United States around 1979–1980.[10] In September 1979, WSI sued Tabur UK in Britain for infringement of WSI's British sailboard patent.[11] In January 1981, WSI sued Tabur Marine and Dufour in the United States for infringement of WSI's original United States patent.[12]

### 2) *Basis for BIC Leisure's Belief that the WSI Reissue Patent was Invalid*

Four witnesses testified as to BIC Leisure's belief that the WSI reissue patent was invalid and the basis for that belief: 1) William H. Meserole, a patent attorney who participated in the challenges to the WSI patent before the Patent and Trademark Office ("PTO"); 2) Charles G.C.N. Livsey, a British chartered patent agent who was involved in the successful challenge to WSI's British patent; 3) Bruno Bich, Chief Executive Officer of BIC Corporation and President of BIC Leisure; and 4) Alan Lipson, Corporate Counsel of BIC Corporation and Corporate Secretary of BIC Leisure. Based on the testimony of these witnesses and the documentary evidence presented, the following facts were established concerning the basis for WSI's belief that the WSI patent was invalid.

In early 1981, Dufour, BIC Leisure's predecessor corporation, retained William Meserole, a patent attorney, with regard to matters concerning the WSI reissue application. When BIC Leisure was incorporated in 1981, Meserole continued to work with BIC Leisure on the WSI reissue pro-

---

**5.** Tabur Marine S.A., now known as BIC Sport S.A., is a French Corporation, all of whose issued and outstanding shares are now owned by Societe Bic. Joint Pretrial Order at ¶ 1.A.5.

**6.** Dufour was a Delaware corporation which was incorporated in December 1980 and which dissolved in March 1982, whose business in the United States included the selling of sailboards manufactured by Tabur Marine S.A. All of the issued and outstanding shares of Dufour were owned by Tabur Marine S.A. *See* Joint Pretrial Order at ¶ I.A.7.

**7.** Tabur Marine Ltd. is a British corporation, all of whose issued and outstanding shares were owned by Tabur Marine at the times relevant to this decision. Joint Pretrial Order at ¶ 1.A.6.

**8.** All of the sailboards sold in the United States by Dufour and BIC Leisure were made in France by Tabur Marine. Joint Pretrial Order at ¶ 1.A.17.

**9.** WSI's original patent was issued on January 6, 1970. WSI filed its reissue application on May 30, 1978, and the reissue application was still pending in 1981.

**10.** Transcript ("Tr.") at 244.

**11.** Pretrial Order at ¶ I.A.8.

**12.** *See Windsurfing International, Inc. v. Ostermann*, 81 Civ. 254 (MEL).

ceedings through 1982.[13] Meserole, who impressed the court as both competent and experienced in patent matters, had been participating in the legal challenges to the validity of WSI's reissue patent on behalf of another client since WSI filed its reissue application in 1978,[14] and was intimately knowledgeable as to both the history of the WSI patent proceedings and the legal issues involved. Meserole testified that by January, 1979, when the PTO first rejected WSI's reissue claims, he had reviewed all the prior art, including the Darby and Herreshoff articles, and all of the predecessor materials in the file wrapper, and had concluded that the reissue claims which were then pending were unpatentable as obvious under 35 U.S.C. § 103 (1982).[15]

From 1981–1982, Meserole was in continuous communication, both oral and written, with first, Bich and later, Lipson. Meserole first communicated with Bich by telephone in May, 1981, after the PTO Board of Appeals reinstated various of the reissue claims which had previously been rejected. During this initial conference, Meserole told Bich that in his opinion, based on his review of the prior art, the WSI reissue application would eventually fail.[16] He explained in layman's terms that although the Board of Appeals had reinstated certain claims, he felt that the challenge to the reissue application had been strengthened by the discovery of new prior art, most importantly the Crosby reference.[17] Bich testified that he recalled this initial telephone conversation and that he remembered that Meserole had told him generally that "we still had an opportunity to give our case to the Patent Office and that we had a chance to win there. But even if we lost there that if the case got to court we had a good chance to win on this issue."[18]

Meserole confirmed this opinion in a follow-up letter to Bich dated May 22, 1981.[19] In this letter, which was three-and-a half pages long and single-spaced, Meserole told Bich that:

> [t]he essence of the situation is that the original [WSI] patent was submitted to the U.S. Patent and Trademark Office for reissue because of certain prior art which was developed after the issuance of the [WSI] patent some eleven years ago. This prior art, which was unknown to the Patent Examiner at the time of the original application, was believed, and is still believed, to threaten the validity of the patent and if this position proved to be true, [WSI] would be without the protective umbrella which the patent affords.[20]

Meserole continued that, despite the Board of Appeal's decision,

> [t]he [reissue] application is still before the Patent Office and a number of procedural steps are open to us in order to convince the Patent Office that the claims are unpatentable and we are pursuing each of these avenues diligently with what appears to us, at this time, to be a realistic possibility of success.[21]

Finally, Meserole discussed the chances of success in federal district court if the reissue patent were eventually granted by the PTO:

> The Federal District Court is the body charged with the ultimate determination of the validity or lack thereof of the patent and they are not bound by the action in the Patent Office, although it must be recognized that the potential validity of the patent would be strengthened by the granting of a reissue patent after a vigorous protest in which we have participated....

13. Tr. at 43.

14. Tr. at 46–49 (Meserole testimony).

15. *Id.* at 364–66.

16. *Id.* 385–388, 390–393.

17. *Id.* at 392–393.

18. Tr. at 225 (Bich testimony).

19. Plaintiff's Exhibit ("PX") 671. By agreement of the parties, WSI is denominated "plaintiff" in this litigation and BIC Leisure is denominated "defendant", although BIC Leisure is nominally the plaintiff and WSI the defendant in this particular action. Joint Pretrial Order at ¶ III.A.

20. *Id.* at p. 1.

21. *Id.* at p. 2.

Notwithstanding the foregoing, we are of the opinion that even if the Patent Office does ultimately allow the Schweitzer patent, we still have a very good chance of convincing the District Court that the patent is in fact invalid. It is difficult, if not impossible, to quote with any degree of reliability the statistical odds in this regard, but we are of the opinion that we have at least a fifty-fifty chance, if not better.[22]

A week later, Meserole sent Bich a copy of the brief requesting reconsideration of the Board of Appeal's decision which was filed with the PTO.[23] This brief described in detail the legal arguments supporting rejection of the reissue patent, and attached to it were copies of the articles relevant to the prior art claims, including the Crosby article. Meserole then continued to have periodical telephone conferences with Bich throughout the summer and early fall of 1981,[24] during which he kept Bich up-to-date with developments concerning the reissue proceedings and reiterated his opinion concerning the likelihood of success.

Bich received and looked at various letters and enclosures which Meserole sent him, including the brief described above. Bich stated that although he did not understand these written communications and technical enclosures in detail, Meserole would usually explain them to him in layman's terms in subsequent telephone conversations.[25] Finally, Bich testified that his impression of Meserole, based on these written and oral communications, was that Meserole was knowledgeable, knew what he was talking about, and that Meserole was confident that there was a good chance of winning the case against WSI.[26]

In the early fall of 1981, when BIC Corporation made the decision to go into the sailboard business in the United States, Bich turned over his file on the reissue proceedings to Lipson.[27] Lipson, who is a lawyer but not a patent specialist, reviewed the entire file given to him by Bich, including the prior art references, and then took over communications with Meserole.[28] During subsequent conversations, in person and by telephone, Meserole continued to assure Lipson, as he had Bich, that the reissue patent would be invalidated.[29]

In April 1982, WSI's British patent was held invalid by the British Patents Court.[30] This decision was based on two grounds. The first ground was anticipation by prior public use, based on the construction of a sailboard in England by a young child, Peter Chilvers, in 1958. The second was obviousness based on the Darby prior art.

Livsey, Meserole and Lipson all testified that this British decision confirmed and indeed strengthened their opinion that the WSI's United States reissue patent would be invalidated. Livsey, a British patent agent experienced in both American and British patent matters, testified as an expert on the comparability of American and British patent proceedings.[31] He testified that the law of obviousness is essentially the same under both American and British patent law, and that the relevant claims in WSI's American and British patents were virtually identical.[32] Hence, Livsey stated that after the British decision he became even more "bullish" that WSI's reissue patent in the United States would be declared obvious on the grounds of obviousness based on the Darby prior art. He thought that BIC Leisure's position would be even

22. *Id.*

23. PX 705.

24. Tr. at 393–394 (Meserole testimony); *see also* Defendant's Exhibit ("DX") 337 (bill from Meserole for telephone conferences and discussions with Bich and other Dufour personnel from May-July 1981).

25. Tr. at 229–39 (Bich testimony).

26. *Id.* at 230.

27. *Id.* at 230–31.

28. Tr. at 423–24 (Lipson testimony).

29. Tr. at 397–99 (Meserole testimony); 426–427 (Lipson testimony).

30. PX 684.

31. Tr. at 264.

32. *Id.* at 295–97.

stronger in the United States than in Britain because the Darby prior art was developed in the United States and because the United States has a one hundred year history of wishbone rigging technology.[33] Livsey communicated these opinions to Meserole and Lipson, and Lipson testified that the British decision "tremendously" raised BIC Leisure's confidence of success.[34]

The WSI reissue patent issued in March 1983. Shortly afterwards, BIC Leisure filed the present action for a declaration that the reissue patent was invalid. For trial counsel, BIC Leisure retained Pennie & Edmonds, a law firm with substantial experience in the patent area and very high standing in the patent bar. As early as 1981, Pennie & Edmonds had given a written, preliminary opinion that the WSI reissue patent was invalid,[35] and, of course, as trial counsel the firm continued to express that opinion to BIC Leisure orally during the pendency of the liability phase of this action.[36]

\* \* \* \* \* \*

WSI argues that BIC Leisure did not have a reasonable basis for its belief in the invalidity of the reissue patent because BIC failed to obtain a formal, written legal opinion stating that the reissue patent was invalid. However, lack of such a formal opinion is not determinative. The Court of Appeals for the Federal Circuit has upheld findings of non-willfulness in cases where the only legal opinion was given orally, *see, e.g., Radio Steel & Manufacturing Co. v. MTD Products, Inc.,* 788 F.2d 1554, 1559 (Fed.Cir.1986), and indeed, in cases where no legal advice was sought at all, *see, e.g., Rolls-Royce Limited v. GTE Valeron Corp.,* 800 F.2d 1101, 1109 (Fed.Cir.1986). The key issue is whether BIC Leisure sought and obtained competent legal advice, *see Underwater Devices Inc. v. Morrison-Knudsen Co.,* 717 F.2d 1380, 1389–90 (Fed.Cir.1983), and it is determined that BIC Leisure did so. Bich and Lipson sought out the advice of Meserole, Livsey,

and Pennie & Edmonds, all competent and experienced in patent law, and received a number of well reasoned and sound opinions, both oral and written, which stated that the WSI reissue patent was invalid. The competency of these opinions will not be discounted because they were cautious in tone and did not guarantee victory to BIC Leisure, but instead expressed the reality that this was a case where the issues were difficult and close. *Cf. Kloster Speedsteel AB v. Crucible Inc.,* 793 F.2d 1565, 1581 (Fed.Cir.1986) (Federal Circuit expressed concern that "awards of increased damages ... not be allowed to thwart efforts to challenge the validity of patents believed in good faith to be invalid ... particularly when the issues may fairly be described as 'close.'"), *cert. denied,* —— U.S. ——, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987).

WSI also argues that it was unreasonable for BIC Leisure to rely on the British patent decision as an indication that the United States reissue patent was valid, and that, in fact, all testimony relating to the British decision and its impact on BIC Leisure's state of mind is irrelevant. For these propositions, WSI relies on the statement in *In re Dulberg,* 472 F.2d 1394, 1398 (C.C.P.A.1973) that:

> [t]he granting of a patent on an "invention" in a foreign country has no relevance to the determination of whether the same "invention" would be obvious within the ambit of § 103 since it is notoriously well known that the standards of patentability vary from country to country.

However, while evidence of the British decision was properly held to be irrelevant under *In re Dulberg* during the liability phase of this action, it is relevant to this damage proceeding, where the issue is not whether the reissue patent was obvious, but whether BIC Leisure's beliefs concerning the invalidity of the reissue patent were reasonable. Livsey, Meserole, and Lipson

---

**33.** *Id.* at 307–309.

**34.** Tr. at 442 (Lipson testimony).

**35.** PX 683.

**36.** Tr. at 234–35 (Bich testimony).

were not encouraged by the British decision because they thought they could introduce it in evidence at trial, but because it was a promising endorsement of their theory that the Darby prior art rendered the reissue patent obvious.[37]

In sum, based on the above testimony and evidence, it is determined that BIC Leisure did discharge its affirmative duty to form a reasonable, good-faith basis that WSI's reissue patent was invalid.

## II. *Copying*

WSI argues that the BIC businesses deliberately copied WSI's sailboards when Tabur Marine began manufacturing sailboards in France in the late 1970s. Numerous courts have held that an infringer's "faithful copying" of a patented product demonstrates an intentional disregard for the patent owner's rights and supports an award of enhanced damages under § 284, *see, e.g., Milgo Electronic Corp. v. United Business Communications, Inc.,* 623 F.2d 645, 666 (10th Cir.), *cert. denied,* 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980); *American Safety Table Co. v. Schreiber,* 415 F.2d 373, 378–79 (2d Cir.1969), *cert. denied,* 396 U.S. 1038, 90 S.Ct. 683, 24 L.Ed.2d 682; *Indecor, Inc. v. Fox-Wells & Co., Inc.,* 642 F.Supp. 1473, 1492 (S.D.N.Y. 1986). Evidence of willful infringement has been found even if the copying took place before the patent actually issued. *See Milgo,* 623 F.2d at 666.

However, in these decisions the patent owner was able to establish at trial that the infringer had actually used the product in question as a blueprint to create a virtually identical product—a "faithful" or a so-called "chinese" copy. *See Milgo,* 623 F.2d at 652–53 (patent infringer secretly copied

patented product); *American Safety Table Co.,* 415 F.2d at 379 (patent infringer decided to "make a facsimile" of patented product); *Indecor,* 642 F.Supp. at 1481–82, 1489 (patent infringer used sample of patented product to manufacture its infringing protect).

Here, in contrast, WSI has submitted no evidence that BIC Leisure directly and deliberately copied WSI's sailboards, and although BIC Leisure's sailboards have been found to infringe the WSI reissue patent literally, there has been no showing that BIC Leisure's sailboards are virtually identical to WSI's. Instead, WSI argues that copying may be inferred by the fact that BIC Leisure had access to WSI's sailboards before it began to manufacture its own, and by the similarity between WSI's and Bic's sailboards. WSI has not pointed to any cases where an *inference* of deliberate copying was used to support a finding of willful infringement under § 284, and at any rate, such an inference would not be justified here, where the allegations of access and similarity are general rather than specific.

WSI also argues that BIC Leisure made a conscious decision to continue to copy WSI's sailboards in early 1982. At that time, Meserole forwarded to Lipson a draft of an article by James Drake, the co-inventor of the sport of windsurfing.[38] In the article, Drake described his ideas for three alternate sailboard designs, which he suggested would be *"better* than those currently patented ... and which avoid the patent's claims."[39] WSI argues that BIC Leisure's failure to develop Drake's suggestions is evidence of its willful infringement. This argument is purely speculative. There are many sound business rea-

---

**37.** WSI also argues that BIC Leisure should not reasonably have been encouraged by the British decision because "the primary ground" of the decision was the Chilvers anticipation. Pre-trial Statement By Windsurfing of the Law Controlling Determinations of Willfulness of Infringement and Attorneys' Fees Issues in Patent Cases and a Statement of the Facts of this Case ("WSI Pre-trial Statement") at 56. However, the British Patents Courts decision clearly stated that "the attack based on obviousness in the light of the Darby disclosure also succeeds," indicating that the Darby prior art was a separate and

independent ground for invalidation. *See* PX 684 at A1521. On appeal, moreover, the High Court of Justice noted, before even discussing the Chilvers evidence, that the affirmance of the decision below on the grounds of obviousness based on the Darby prior art was "sufficient to dispose of the appeal...." DX 149 at p. 22.

**38.** PX 692.

**39.** PX 694 at p. 1.

sons why BIC Leisure might have lacked interest in these designs. Although Walter S. Bradfield, WSI's expert witness on sailboard design, testified that Drake's first suggested design was technically feasible in the sense that it would be possible to build such a sailboard[40], his testimony, taken as a whole, suggested that such a sailboard might be less easy to handle.[41] He also stated that Drake's other suggested designs were not practical.[42] Furthermore, there is no evidence that any of Drake's suggested designs would be commercially feasible to build. Finally, at the time BIC Leisure received Drake's article, WSI's original patent was under rejection by the PTO,[43] and, as discussed above, BIC Leisure had already formed a good faith belief that the patent was invalid.

## III. *BIC Leisure's Post-Injunction Behavior*

The final factor to be considered in determining whether infringement has been willful is the infringer's behavior as a party to the litigation, *Bott,* 807 F.2d at 1572, including any post-injunction infringement, *see Paper Converting Machine Co. v. Magna-Graphics Corp.,* 785 F.2d 1013, 1015–16 (Fed.Cir.1986). Here, WSI contends that BIC Leisure violated the injunction entered against it in September, 1985 by 1) transferring 1,240 sailboards to BIC Sport in Canada[44] between February—June 1986; and 2) transferring various sailboard parts to its customers in continuation of its warranty program. BIC Leisure does not deny that these activities took place but argues that they were allowed under the injunction, undertaken with advice of counsel, and do not indicate indifference to WSI's proprietary rights.

### a) *Transfer of Sailboards to BIC Sport in Canada*

Lipson testified that both BIC Leisure and BIC Sport in Canada are wholly owned subsidiaries of BIC Corporation. He stated that the sailboards, which were in BIC Leisure's inventory at the time the injunction was entered, were transferred to BIC Sport at exactly the cost of transfer to BIC Leisure, that the transaction had no taxable consequences, and that in fact because of the transfers BIC Leisure received a "duty drawback" from United States Customs, by which the import duties which BIC Leisure paid when it imported the sailboards from France were returned. Lipson testified that it was his opinion that title to the sailboards passed in Canada, based on the fact that BIC Leisure paid freight and transportation costs to Canada.[45]

Finally, Lipson testified that he consulted trial counsel before making the transfers, and received an oral opinion that they would not violate the injunction. He said that he thought he did not require a written opinion because he regarded the transactions as intra-company transfers, not sales, and because he knew that BIC Sport in Canada had a license from WSI and hence that WSI would be paid royalties when the sailboards were sold.[46] Bich also testified that he had received an oral assurance from trial counsel that the transfers were legal.[47]

WSI argues that the transfer of sailboards to Canada violated 35 U.S.C. §§ 271(f) (Supp. II.1984). § 271 imposes liability as an infringer on one who:

> supplies ... from the United States [certain components of a patented invention], where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such

**40.** Tr. at 22–23, 27.

**41.** *Id.* at 28–30.

**42.** *Id.* at 32.

**43.** *See Windsurfing I.,* 613 F.Supp. at 943–944 (describing the history of the prosecution of the reissue patent).

**44.** BIC Sport Canada is an unincorporated division of BIC, Inc., a Canadian corporation, all of the issued and outstanding shares of which are owned by BIC Corporation. Pretrial Order at ¶ 1.A.4.

**45.** Tr. at 181–83.

**46.** Tr. at 186–88.

**47.** Tr. at 238.

components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States....[48]

BIC Leisure, however, contends that Congress intended that § 271 should only apply to infringers who supply from the United States components *manufactured* in the United States. It is unnecessary and would be inappropriate to resolve this issue determinatively at this late stage in the litigation which concerns only damages. This dispute is only relevant to the extent it sheds light on whether BIC Leisure's conduct was reasonable with regard to WSI's patent rights, and a brief examination of the history of § 271(f) reveals that BIC Leisure's position was at least reasonable.

§ 271(f) was added to § 271 by Congress in 1984 as part of the Patent Amendments Act of 1984. Prior to the addition of § 271(f), a patent infringer was defined as "whoever ... makes, uses, or sells any patented invention, within the United States during the term of the patent...." 35 U.S.C. § 271(a) (1982). The statute did not define the terms "makes," "uses" and "sells." In a 1972 decision, *Deepsouth Packing Co. v. Laitram Corp*, 406 U.S. 518, 92 S.Ct. 1700, 32 L.Ed.2d 273 (1972), the Supreme Court held that § 271(a) did not impose liability on a manufacturer who had manufactured parts of a patented machine and then exported them for assembly abroad, because the manufacturer did not literally "make" the patented object in the United States. The Supreme Court reject-

ed the definition applied by the court below that the term "makes" in § 271 referred to "the substantial manufacture of the constituent parts of the machine," 406 U.S. at 527, 92 S.Ct. at 1706 (quoting from 443 F.2d 936, 939 (5th Cir.1979)), holding instead that "a combination patent protects only against the operable assembly of the whole and not manufacture of its parts," *id.* at 528, 92 S.Ct. at 1707, in the absence of clear congressional intent to the contrary, *id.* at 532, 92 S.Ct. at 1708.

The legislative history of the Patent Law Amendments Act of 1984 states that § 271(f) "respond[s] to the ... decision in *Deepsouth Packing Co. v. Laitram Corp*, ..., concerning the need for a legislative solution to close a loophole in the patent law".[49] A sponsor of the Patent Law Amendments Act of 1984, speaking from the floor of the House of Representatives, described § 271(f) as providing that "a product's patent protection cannot be avoided through the *manufacture* of component parts within the United States for assembly outside the United States" (emphasis added).[50] Although there are not yet any judicial decisions squarely interpreting the scope § 271(f), based on this legislative history, it is not unreasonable to conclude 1) that § 271(f) was intended to overrule *Deepsouth* by expanding the definition of "makes" in § 271(a) to prohibit the partial manufacture or assembly of patented objects or their component parts in the United States for export to foreign countries; and 2) that § 271(f) would not apply here,

---

**48.** 35 U.S.C. § 271(f)(1). § 271(f)(1) applies to the supply of "all or a substantial portion of the components of a patented invention." § 271(f)(2) applies to the supply of "any component of a patented invention that is especially made or adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial noninfringing use." WSI argues that BIC Leisure has violated both § 271(f)(1) and (2).

**49.** 130 Cong.Rec. H10525 (Oct. 1, 1984), 98th Cong., 2d Sess., *reprinted in* 1984 U.S.Code Cong. & Ad.News 5827, 5828.

**50.** Remarks of Rep. Kastenmeier, *reprinted in,* 28 Pat. Trademark & Copyright J. (BNA), No. 699, 645 at 652 ("Text of H.R. 6286 and H.R. 6285 and Floor Remarks"). *See also* 29 Pat. Trademark & Copyright J. (BNA), No. 705, 33

("Changes In Intellectual Property Law Are Assessed During Recent Conference"), at 38 (commentator at conference reported as stating that "[i]n amending § 271 ... Congress closed what many perceived as a loophole in the patent law. New § 271(f) now proscribes as patent infringement the *making* of components of a patented product in the U.S. for assembly abroad" (emphasis added)); *but cf. Smith International, Inc. v. Hughes Tool Co.*, 229 U.S.P.Q. 81, 101 (C.D. Cal.1986) [Available on WESTLAW, DCT database] (§ 271(f) "sweep[s] within the ambit of damages to be calculated for infringement, certain foreign manufactured objects where the American company has *provided* parts or other aid and assistance to the foreign manufacturer") (emphasis added) (dicta).

where, in a situation not discussed in *Deepsouth*, BIC Leisure shipped from the United States to Canada unassembled sailboards which had been made in France and which had simply been stored in the United States.

In sum, I find that there was a reasonable basis for BIC Leisure's belief, after consultation with counsel and receiving a favorable oral opinion, that transfer of sailboards to BIC Sport Canada would violate neither the terms of the injunction or § 271(f).

### b) *Continuation of the Warranty Program*

After the injunction was entered against BIC Leisure in September, 1985, BIC Leisure continued its no-charge warranty program through which it supplied prior customers with spare replacement parts when necessary. Both Lipson and Bich testified that before the injunction took effect, BIC Leisure sought and received an oral opinion from trial counsel that continuation of the warranty activity would not violate the injunction.[51] This opinion was confirmed in a written statement of opinion issued on March 29, 1986.[52] Bich also testified that he was personally satisfied that the warranty program did not violate the injunction because BIC Leisure received no profit and in fact lost money by continuing to replace parts.[53]

WSI concedes that BIC Leisure received a "proper, reasoned opinion" on the legality of continuing the warranty program, but argues that the opinion incorrectly stated the law and that, in fact, BIC Leisure's warranty program violated the injunction.[54] It is not necessary here to determine the merits of WSI's claim. BIC Leisure's continuation of the warranty program was reasonably based on the advice of counsel, both oral and written, and cannot be con-

sidered willful activity displaying indifference to WSI's rights.

### c) *Other Post-Injunction Activity*

Bich testified that his attitude toward observing the terms of the injunction was "[o]ne, make sure that you respect everything that you have to respect, and two, make sure, double sure, that the information that you are getting from your lawyer is correct."[55] Based on those precepts, Bich chose not to engage in some activities which counsel advised him would be legal, such as the sale of spare parts, because in Bich's judgment they seemed questionable.[56] Bich also testified that it was his decision to go to court for a determination of whether BIC Leisure could participate in trade shows, even though counsel had advised him that it would be proper, because to Bich, advertising at a trade show seemed to have a "commercial aspect."[57] Finally, Bich testified that he offered to take back BIC sailboards from dealers who had already bought them, even though it was his understanding that BIC Leisure was not legally obligated to do so.[58] These actions on Bich's part evidence a good-faith effort to abide by the terms of the injunction.

It is concluded that BIC Leisure's post-injunction behavior does not demonstrate willful infringement or indifference to WSI's rights. The record as a whole reflects that BIC Leisure generally respected the terms of the injunction and that its post-injunction activities were guided by the advice of counsel and by Bich's common sense judgement.

\* \* \* \* \* \*

In sum, it is concluded, based on the record as a whole, that WSI has not met its burden of proof to establish BIC Leisure's willful infringement by clear and convincing evidence.

---

**51.** Tr. at 170–172 (Lipson testimony), 245–47 (Bich testimony).

**52.** PX 698.

**53.** Tr. at 237 (Bich testimony).

**54.** WSI Pre-Trial Statement at 63.

**55.** Tr. at 239–40 (Bich testimony).

**56.** *Id.* at 237, 240–41.

**57.** *Id.* at 238–39.

**58.** *Id.* at 241–42.

### Attorney Fees

 Under 35 U.S.C. § 285 (1982), "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." A case may be rendered "exceptional" by either willful infringement or by bad faith behavior displayed during the course of the litigation. *See Kloster Speedsteel AB v. Crucible Inc.*, 793 F.2d 1565, 1580 (Fed.Cir.1986). Here, as discussed above, it has already been determined that BIC Leisure is not guilty of willful infringement, and there is no allegation that BIC Leisure engaged in any misconduct during the course of this litigation. Accordingly, WSI's request for attorney fees under § 285 is denied.

\* \* \* \* \* \*

In conclusion, it is determined that WSI should not be granted enhanced damages under 35 U.S.C. § 284 or attorney fees under 35 U.S.C. § 285.

Submit proposed order upon notice.