BIC LEISURE PRODUCTS, INC. and
Windglider Fred Ostermann,
GmbH, Plaintiffs,

v.

WINDSURFING INTERNATIONAL,
INC., Defendant,

and

James R. Drake, Intervenor–Defendant.

No. 83 Civ. 3774(MEL).

United States District Court,
S.D. New York.

April 8, 1991.

Pennie & Edmonds, New York City, for plaintiff BIC Leisure Products, Inc. (Jonathan A. Marshall, Robert M. Kunstadt, John J. Normile, and Anneliese M. Schaefer, of counsel).

Harold E. Wurst, Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst, Los Angeles, Cal., for defendant (Michael Sweedler, Darby & Darby, New York City, of counsel).

1. See *Windsurfing International, Inc. v. Fred Ostermann GMBH*, 613 F.Supp. 933 (S.D.N.Y. 1985), *aff'd in relevant part, rev'd in part, vacated in part and remanded sub nom Windsurfing International, Inc. v. AMF, Inc.*, 782 F.2d 995 (Fed.Cir.), *cert. denied*, 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986); *BIC Leisure Products, Inc. v. Windsurfing International, Inc.*, 83 Civ. 3774 (MEL), Judgment at ¶ 3 (S.D.N.Y. Sept. 11, 1985).

LASKER, District Judge.

In the liability phase of this case, U.S. Patent Re. 31,167 (the "reissue patent") held by Windsurfing International, Inc. ("WSI") on its sailboard design was found to be valid. BIC Leisure Products, Inc. ("BIC") was found to have infringed the WSI reissue patent and enjoined from any further infringement.[1]

■ A successful plaintiff in a patent infringement action is entitled to "damages adequate to compensate for the infringement but in no event less than a reasonable royalty for the use made of the invention by the infringer...." 35 U.S.C. § 284 (1982). If a patent owner can establish with reasonable probability that he or she would have made sales made by the infringer, an award based on lost profits is appropriate. *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 863 (Fed.Cir. 1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986). Otherwise, damages equal to a reasonable royalty must be awarded.

A bench trial to establish WSI's actual damages was held in July and August of 1990. WSI argues that the evidence at trial established total damages in the amount of $8,745,444.00 in lost profits. BIC contends that the evidence as to WSI's actual damages is too speculative to support an award based on lost profits and proposes that the court calculate damages based on a reasonable royalty of 7½%[2] of the net sales price of the boards sold by BIC between March 8, 1983 and September 30, 1985 which were neither in inventory nor on order as of March 8, 1983, with interest at the Treasury Bill rate. On that basis, BIC states that the proper amount of an award to WSI is $448,661, before interest.

Windsurfing's requests for enhanced damages for alleged willful infringement under 35 U.S.C. § 284 and for attorney's fees under 35 U.S.C. § 285 were denied in a previous opinion appearing at 668 F.Supp. 812 (S.D.N.Y.1987). BIC's motion to define and limit the accounting issues was denied at 687 F.Supp. 134 (S.D.N.Y.1988).

2. 7½% was the royalty charged by Windsurfing to its licensees during the relevant time period.

■ I find that a reasonable royalty is insufficient to compensate WSI and that the evidence establishes damages to WSI in the amount of $2,851,555. WSI is also entitled to prejudgment interest at the Treasury Bill Rate from time to time.

## I. CALCULATION OF LOST PROFITS

### A. Damages Based on Market Share

■ "In order to recover lost profits a patentee must show a reasonable probability that, but for the infringement, it would have made the sales that were made by the infringer." *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1326 (Fed.Cir.1987).

> To obtain as damages the profits on sales he would have made absent the infringement, i.e., the sales made by the infringer, a patent owner must prove: (1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made.

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978).

### 1. *Demand for the Patented Product*

Determination of whether there was sufficient demand for WSI's product to warrant an award of damages based on lost profits requires some discussion of WSI's place in the sailboard market during the relevant time period.

The evidence at trial demonstrated that WSI's marketing efforts were based on the concept of a "One–Design Class" with a Class Association sponsoring Class regattas. The WSI "Classic" or "One–Design" sailboard accounted for approximately 80% of WSI's sales. Essentially all WSI's sailboard models were based on the original WSI hull form.[3] While BIC acknowledges that during the mid to late 1970s, WSI enjoyed a relatively good reputation, BIC asserts that by 1983 (the beginning of the period for which WSI is seeking damages), the image of the WSI sailboard had suffered substantially due to increased competition from European licensees, transformation of the sport of sailboarding from One–Design to Open Class, and the failure of WSI to adopt innovative features which had been incorporated into the new Open Class sailboards.[4]

Evidence at trial traced the development of the competing "fun board" by sailboarding enthusiasts in Hawaii who found that the basic One–Design hull form which had been developed in relatively calm waters off Southern California was unsuitable for strong winds and waves. The fun board was hydrodynamically superior to the original WSI design.[5]

While European manufacturers were quick to adopt the new designs, WSI continued to produce essentially its original hull and rigging. The focus of the European market changed from the previous emphasis on One–Design racing using the WSI hulls, to what was called "open" competition in which boards of various manufacturers (as well as custom-made boards) raced against each other. In open competition, it became clear that the new designs were more versatile than the old WSI design.[6] As the sales of funboards increased, the sales of the older designs (known as "allround" boards) fell off dramatically.

In the early 1980s, WSI's licensees began to introduce innovative products into the United States market. Many licensees used production processes such as blow-molding which produced a high volume of boards at a relatively low price, leading to price competition for WSI. In 1983, for example, HiFly (Akutec) introduced a new line of blow-molded boards which it promoted as "funboards" and put its former models on closeout.[7]

---

**3.** Transcript of Damages Trial ("T.") 1020–26.

**4.** T. 1388–96.

**5.** T. 740–51; Defendant's Exhibit ("DX") 852; DX 854; DX 906 Weyrich Dep. T. 13–21.

**6.** T. 761–78.

**7.** DX 845.

While regattas sponsored by WSI in the 1970s sparked interest in the WSI sailboard, the popularity of the WSI One–Design board waned as sailboarders became conversant with the developments that had been pioneered by the Hawaiians and brought to the mainland United States by the European manufacturers.[8] WSI's image began slipping in the 1980s because it was not changing its models to keep up with the market.[9]

BIC maintains that, in light of the events described above, there is no reasonable probability that WSI would have sold its market share of BIC's sales and that the evidence compels the conclusion that absent BIC, fewer boards would have been sold overall, and BIC's sales would have been made by WSI licensees who were competing head-to-head with BIC in the entry-level market.

BIC argues that the presence of WSI's licensees in the market prevents WSI from proving damages based on lost profits. While BIC acknowledges that the existence of a two-player market is not an absolute prerequisite to the recovery of lost profits, BIC stresses that lost profits recovery in a multi-player market is appropriate only when the patentee can demonstrate clearly its ability to have achieved the sales made by the infringer. BIC argues that in light of the fact that WSI granted licenses under its patent to more than ten manufacturers in the United States and those licensees acquired over 50% of the domestic market by 1984, it is not reasonable to conclude that WSI rather than its licensees would have sold additional sailboards had BIC not been in the market. BIC points out that WSI's licensees, such as Coleman and HiFly, sold products more like BIC's in terms of features, performance and price and employed similar distribution channels.

BIC argues that given the many aspects in which various sailboards makes and models available during the relevant period differed, WSI has not established a demand for its particular product. BIC maintains that the evidence proves that demand for WSI's product was declining sharply because the products manufactured by its licensees were surpassing it in features, performance and price. BIC's expert, Dr. Bockstael, testified that it was quite unlikely that WSI would have achieved its market share percentage of BIC's sales.[10]

BIC asserts that had a reasonable probability existed that WSI could have made a portion of BIC's sales absent the infringement, WSI's sales should have increased after BIC was enjoined, but in fact, WSI's sales did not increase. By contrast, Coleman–O'Brien, a WSI licensee, which had prices and distribution channels similar to BIC, experienced an increase in sales.[11]

Although BIC has done an impressive job of marshalling evidence to explain the decline of WSI as a major player in the sailboard market, this evidence does not negate the fact that during the relevant time period, WSI controlled 29.2% of the sailboard market in 1983, 25.6% in 1984, and 13.6% in 1985. While interest in WSI's product obviously waned during that time period, it cannot be denied that WSI's product, however "obsolete," continued to appeal to a significant portion of the sailboard market. Of course it cannot be known with any degree of certainty what would have happened had BIC not been in the sailboard market during the relevant time period. Accordingly a fact finder must choose among competing assumptions, and it is certainly a reasonable assumption that had BIC not been in the market, WSI would have sold at least its pro-rata share of the sailboards sold by BIC. Moreover there is good authority for the proposition that where, as here, there are several suppliers in the market, it is appropriate to award the patentee lost profits according to its actual market share. *State Industries, Inc. v. Mor–Flo Industries, Inc.*, 883 F.2d 1573, 1579 (Fed.

---

8.  T. 1299–1310; 1391–1401.

9.  T. 321, 495; DX 735; DX 736; DX 737; DX 738; DX 745; DX 746; DX 891; Colt Dep. T. 11, 17; DX 731.

10.  T. 1644–47.

11.  T. 93.

Cir.1989); *Beatrice Foods Co. v. New England Printing & Lithographing Co.*, 899 F.2d 1171, 1173 (Fed.Cir.1990). *State Industries*, 883 F.2d at 1579 ("eminently reasonable for the district court to infer that [plaintiff] could have sold its market share

of [defendant's] infringing sales wherever the opportunity occurred.").

If WSI had picked up its pro rata share of the BIC market, the number of additional sales WSI would have made is calculated as follows:

|  | 1983 | 1984 | 1985 |
|---|---|---|---|
| BIC's Infringing Sales [12] | 7,837 | 8,922 | 15,936 |
| Windsurfing Market Share [13] | 29.2% | 25.6% | 13.6% |
| **Additional Windsurfing Sales** [14] | **2,288** | **2,284** | **2,167** |

BIC asserts the defense of intervening rights to exclude from its infringing sales sailboards in inventory or on order prior to the date WSI's patent was reissued. "Intervening rights, as provided under 35 U.S.C. § 252, is an affirmative defense [citation], that must be raised at trial. 35 U.S.C. § 282. Failure to plead an affirmative defense is a waiver of that defense...." *Underwater Devices, Inc. v. Morrison–Knudsen Co.*, 717 F.2d 1380, 1388 (Fed.Cir.1983). BIC failed to plead intervening rights as an affirmative defense. The Court of Appeals for the Federal Circuit specifically held that AMF (a former codefendant of BIC) had abandoned the defense of intervening rights which it pleaded by failing to raise the defense during the liability phase of the trial, stating

> That AMF pleaded the defense is insufficient. That it failed to make any attempt to prove the defense at trial is in this case fatal. AMF cannot be held to have resuscitated the defense by the mere submission of affidavits at a post-trial hearing. To so hold would run counter to the finality attaching to trials. District courts are under no obligation to consider a defense abandoned at trial.

*Windsurfing International, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 (Fed.Cir.1986). The court noted that "BIC has not raised an intervening rights defense." 782 F.2d

at 1002, n. 11. If AMF abandoned its intervening rights defense by failing to raise that defense at the liability trial, even though AMF had actually pleaded that defense, then it is obvious that BIC waived the defense by failing to plead to or raise it during the liability trial.

2. *Absence of Acceptable Noninfringing Substitutes*

The second factor necessary to prove lost profits damages is the absence of acceptable non-infringing substitutes having all of the beneficial characteristics and advantages of the patented product, which the infringer's customers could buy instead of the patent owner's product. *Central Soya Co. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1579 (Fed.Cir.1983). The existence of a two-supplier market, of course, establishes the absence of acceptable non-infringing substitutes. *See, e.g., Bio–Rad Laboratories, Inc. v. Nicolet Instrument Corp.*, 739 F.2d 604, 616 (Fed.Cir.), *cert. denied*, 469 U.S. 1038, 105 S.Ct. 516, 83 L.Ed.2d 405 (1984).

BIC argues that WSI cannot recover damages for lost profits because the sailboards sold by WSI's licensees, as well as other small watercraft, were acceptable substitutes for the WSI sailboard.

However, with regard to WSI's licensees, as explained above, while it cannot be assumed (and WSI does not suggest) that if BIC had not been in the market, WSI

---

**12.** Plaintiff's Exhibit ("PX") 843, as amended by T. 1261.

**13.** PX 842, as amended by T. 1259.

**14.** PX 844, as amended by T. 1262.

WSI argues that it should also be able to recover lost profits on the additional non-licensed and gray market sales which would have occurred had BIC not been in the market. However, this statement is merely ipse dixit supported by no evidence or persuasive argument.

would have sold *all* of the sailboards sold by BIC, it is reasonable to assume that WSI would have sold its market share of those sailboards.

BIC's argument that WSI should be precluded from recovering lost profits because other small watercraft were acceptable substitutes for sailboards is unpersuasive. Tillson, former president of WSI, testified that there were no other recreational products on the domestic market in 1983, 1984 and 1985 which competed with sailboards. He testified that because sailboards had certain unique features, such as portability and the sensation produced by riding them, other small watercraft such as Hobie Cats and Sun Fish were not competitive with sailboards.[15]

Wiesner, president of WSI licensee O'Brien International, Inc., testified that there was no product that competed with sailboards in terms of the way they are sailed and the reasons consumers purchase them. After studying the issue, he determined that the Hobie Cat, an O'Brien product, appealed to a different group of consumers than sailboards, in part because the Hobie Cat was larger and required different and more advanced skills.[16] At his deposition, Wiesner testified sailboards "did compete very strongly with Hobie Cats" insofar as sailboarding was something that a Hobie Cat owner might do instead of or in addition to sailing the Hobie Cat. However, factors that he mentioned in his testimony such as the high price of the Hobie Cat, the time required to assemble and disassemble it each time it was used, and the difficulty involved in storing it make it clear that the Hobie Cat would not qualify as an acceptable alternative to a sailboard, which was significantly cheaper, smaller and easier to assemble.[17]

Mark Fraser, a former executive of two different WSI licensees (HiFly America Sports and Fanatic, Ltd.), testified that there was no other sport which competed directly with sailboarding.[18] In addition, there was extensive testimony at the liability trial with regard to the unique experience of using sailboards as opposed to other products.[19] There is no reason to believe that if BIC had not been in the market, its sailboard customers would have purchased some other product rather than buying sailboards from WSI or its licensees.

3. *Manufacturing and Marketing Capability*

BIC argues that WSI would not have been able to produce and sell its share of BIC's sales because of deficiencies in its manufacturing and marketing processes. BIC claims that WSI experienced material shortages and production problems which prevented WSI from satisfying actual product demand and would certainly have prevented WSI from selling the additional sailboards which it claims it would have sold had BIC not been in the market.[20] BIC argues that the labor-intensive rotomolding process—in effect at WSI's plant—prevented it from competing effectively in a market which demanded the capability to produce large numbers of sailboards at favorable prices.

Evidence at trial established that WSI did experience product availability problems throughout the 1983 season and until at least April 1984. WSI's production fell behind schedule due to material shortages and problems with the newly-introduced "Duralite" process. WSI invested heavily in the Duralite process in an effort to solve its product quality problems and make its product lighter and more competitive in open-class racing. However, the changes in production equipment required to implement the Duralite process interfered with WSI's ability to meet existing demand and significantly increased its production costs and scrap rates in 1985.[21]

BIC also charges that WSI was not able to achieve an effective or coherent marketing policy due to the fact that the position of director of marketing was held at varying points in over a six to seven year period

15. T. 513–516.
16. T. 78–79.
17. DX 907—Wiesner Dep. T. 79–81.
18. T. 305.
19. PX 884.
20. T. 646–47.
21. T. 640–44; 647–48; 1567; 1597–98.

by four different people.[22] BIC states that "myriad" changes in WSI's sales force led to dissatisfaction amongst dealers.[23]

While evidence of management problems at WSI casts some doubt on whether the company was capable of producing and marketing its share of the sailboards sold by BIC, several factors lead to the resolution of that doubt in favor of WSI. First, WSI produced a reasonably attractive product, as established by its actual sales during the relevant time period, as well as the testimony of witnesses at trial. Second, WSI had the physical space, machinery and sales force required to produce and market the additional sailboards. Hoyle Schweitzer testified that WSI could "easily ... have added another 50 percent to our production,"[24] and that WSI's sales force would have been sufficient to market the increased numbers.[25] Tillson, another WSI executive, gave testimony which supported Schweitzer's conclusions.[26] The evidence also establishes that Schweitzer staffed WSI on a level sufficient for the production of 50,000 boards per year[27] and that from 1982 on, WSI's inability to meet its sales forecasts resulted in overstaffing.[28]

Moreover, a comparison of WSI's actual sales with the number of additional sales it might have made had BIC not been in the market supports the conclusion that WSI would have been able to produce and market the relatively small number of additional sailboards it could have sold had BIC not been in the market. In the relevant years, WSI made the following actual sales:

|  | 1983 | 1984 | 1985 |
|---|---|---|---|
| Actual WSI Sales [29] | 9,773 | 12,007 | 6,388 |

If BIC had not been in the market, WSI would have had the opportunity to make the following additional sales:

|  | 1983 | 1984 | 1985 |
|---|---|---|---|
| Additional WSI Sales | 2,288 | 2,284 | 2,167 |

In 1985, WSI sold 5,619 fewer sailboards than it sold in 1984. According to Schweitzer's testimony, in 1984, WSI would have been capable of producing and selling 6,003 additional boards. Between 1983 and 1984, WSI's actual sales increased by 2,234 and, according to Schweitzer's testimony, production and sales in 1983 could have been increased by as much as 4,886. I find that, but for BIC's infringement, WSI could have produced and sold at least an additional 2,288 boards in 1983, 2,284 boards in 1984, and 2,167 additional boards in 1985.

As noted by the Court of Appeals for the Federal Circuit, "Fundamental principles of justice require us to throw any risk of uncertainty upon the wrongdoer rather than upon the injured party." *Kori Corp. v. Wilco Marsh Buggies and Draglines, Inc.*, 761 F.2d 649, 655 (Fed.Cir.1985). Accordingly, the question whether WSI had adequate manufacturing and marketing capability is resolved in favor of WSI.

**B. Amount of Profit WSI Would Have Made**

WSI relies on the testimony of and exhibits prepared by its expert, Vincent J. DeSi-

---

**22.** T. 1160–62.

**23.** T. 174–80.

**24.** T. 953.

**25.** T. 954.

**26.** T. 502.

**27.** DX 731.

**28.** T. 1157–62.

**29.** PX 813.

mone, for its calculation of damages. In calculating damages, DeSimone employed the "incremental income" approach.

The incremental income approach to the computation of lost profits is well established in the law relating to patent damages ... The approach recognizes that it does not cost as much to produce unit N + 1 if the first N (or fewer) units produced already have paid the fixed costs. Thus, fixed costs—those costs which do not vary with increases in production, such as management salaries, property taxes, and insurance—are excluded when determining profits.

*Paper Converting Machine Co. v. Magna–Graphics Corp.*, 745 F.2d 11, 22 (Fed.Cir. 1984).

BIC argues that the testimony of its accounting expert, John Wynne, demonstrates that WSI's recordkeeping and accounting practices do not provide a satisfactory basis for a damages calculation based upon lost profits.

DeSimone, WSI's accounting expert, testified competently about his calculation of WSI's incremental profit per board. BIC raises a number of challenges to DeSi-

mone's calculation of incremental income, none of which cast serious doubt on the reasonableness of his testimony.

BIC's contention that DeSimone's calculation of average dealer prices is incorrect because he included income from additional components is unpersuasive. As WSI's experts testified, it was common for a customer to purchase a single board with a choice of sails, masts or booms.

BIC's expert Wynne attacked DeSimone's calculation of incremental overhead on the ground that certain costs, such as increased advertising, were left out. However, as WSI points out, BIC presented no evidence to refute the judgment of Schweitzer and DeSimone that such costs would not have been incurred.

BIC offers no plausible reason for accepting its argument that DeSimone should have subtracted WSI's incremental overhead from *BIC's* average dealer price. WSI was entitled to use its *own* average dealer price in calculating what its profits would have been had BIC not been in the market.

Accordingly, WSI's total lost profits are calculated as follows:

|  | 1983 | 1984 | 1985 |
|---|---|---|---|
| WSI Average Dealer Price [30] | $670 | $589 | $571 |
| minus |  |  |  |
| WSI Direct Costs [31] | $305 | $267 | $284 |
| minus |  |  |  |
| WSI Incremental Costs [32] | $ 12 | $ 8 | $ 14 |
| minus |  |  |  |
| Commissions per Sailboard |  |  | $ 12 |
| equals |  |  |  |
| Incremental Profit Per Bd.[33] | $353 | $314 | $261 |
| multiplied by |  |  |  |
| Total Additional Units | 2,288 | 2,284 | 2,167 |
| equals | $819,104 | $717,176 | $565,587 |

**$2,101,867 total lost profits.**

---

**30.** PX 813.

**31.** Direct costs are such items as raw materials and direct labor, which are not a function of the number of boards produced. The direct costs are set out in PX 824.

**32.** The incremental costs of producing an additional sailboard are shown on PX 830. See T. 1251.

**33.** PX 831.

## II. LOST ROYALTIES

WSI is entitled to a reasonable royalty for the sailboards that its licensees would have sold absent BIC's infringement. Lost royalties are calculated as follows:

|  | 1983 | 1984 | 1985 |
|---|---|---|---|
| Licensees Market Share [34] | 63.4% | 63.8% | 75.7% |
| BIC's Infringing Sales | 7,837 | 8,922 | 15,936 |
| Total Average Dealer Price [35] | $468 | $415 | $440 |

**$749,688.**[36] total lost royalties.

## III. PRICE EROSION

A patent holder is entitled to an award of damages equivalent to price reductions made to compete with an infringer, if price reductions can be proved. *Yale Lock Mfg. Co. v. Sargent*, 117 U.S. 536, 6 S.Ct. 934, 29 L.Ed. 954 (1886). WSI attempted to establish at trial that BIC's presence in the market place depressed the prices at which WSI and other manufacturers such as O'Brien were able to sell sailboards in the U.S. market. The evidence in this regard is too speculative to support an award of lost profits. WSI proposes that had BIC not been in the market place, WSI would have made the sales it actually made as well as its proportional share of BIC's sales, at prices higher than the prices WSI actually charged and substantially higher than the prices charged by BIC. WSI has not met its burden of proving that the market would have borne such a price increase. The testimony of BIC's expert, Dr. Bockstael, as to the elasticity of the sailboard market (i.e., a certain number of consumers would be willing to buy at a lower price but not at a higher price) casts considerable doubt on the reasonableness of WSI's suggestion that it could have successfully raised prices.

## IV. TOTAL DAMAGES

WSI's total actual damages are calculated as follows:

| Lost Profits | $2,101,867 |
|---|---|
| Lost Royalties | $ 749,688 |
| **Total Actual Damages** | **$2,851,555.** |

## V. PREJUDGMENT INTEREST

35 U.S.C. § 284, which provides for the award of damages for patent infringement, states that "interest and costs as fixed by the court" are to be awarded. The purpose of prejudgment interest is to "compensate for the delay a patentee experiences in obtaining money he would have received sooner if no infringement had occurred." *Paper Converting*, 745 F.2d at 23.

WSI argues that interest should be awarded at the prime rate plus two percent so as to compensate WSI for the high rate of interest it had to pay on the money it borrowed during the period of BIC's infringement. The appropriate method of recovering this alleged loss is not as prejudgment interest but as an additional element of damages. However, WSI has not requested that it be awarded the cost of borrowing money as an element of its damages and even if it had made such a request, it is doubtful that it would have been able to establish what portions of its borrowing, if any, were caused by BIC's infringement.

BIC argues that the fact that WSI had to pay interest at a rate above prime was the consequence of WSI's poor financial condition, which had existed prior to BIC's in-

---

**34.** PX 842; T. 1259.

**35.** PX 818, 819 and 820; T. 1241.

**36.** PX 846; T. 1264.

fringement. Therefore, BIC maintains that interest should be awarded based on the rate of United States Treasury Bills, the rate specified in 28 U.S.C. § 1961 for post-judgment interest.

The Court of Appeals for the Federal Circuit has held that "[t]he three-month Treasury Bill represents a benchmark as the shortest term, risk-free investment available to ordinary investors and is a proper basis upon which to compensate [the patentee] for the foregoing use of any money. *Allen Archery, Inc. v. Browning Manufacturing Co.*, 898 F.2d 787, 789 (Fed.Cir.1990). WSI has not demonstrated that interest at a rate higher than the Treasury Bill rate is necessary to compensate it for economic loss caused by BIC's infringement.

Accordingly, I find that WSI is entitled to prejudgment interest at the Treasury Bill Rate from time to time.

Submit judgment on notice in the principal amount of $2,851,555 together with prejudgment interest.