**BIC LEISURE PRODUCTS, INC.,**
**Plaintiff–Appellant,**

**and**

**Windglider Fred Ostermann,**
**GmbH, Plaintiff,**

v.

**WINDSURFING INTERNATIONAL,**
**INC., Defendant/Cross–**
**Appellant,**

**and**

**James R. Drake, Defendant.**

**Nos. 92–1106, 92–1107.**

United States Court of Appeals,
Federal Circuit.

Aug. 4, 1993.

Rehearing Denied Sept. 7, 1993.

Jonathan A. Marshall, Pennie & Edmonds, of New York City, argued for plaintiff-appellant. With him on the brief were Robert M. Kunstadt and John J. Normile.

Harold E. Wurst, Nilsson, Wurst & Green, of Los Angeles, CA, argued for defendant/cross-appellant. With him on the brief was *Jai Ho Rho.* Also on the brief were Michael Sweedler and Beverly Goodwin, Darby & Darby, of New York City, of counsel.

Before NIES, Chief Judge, SMITH, Senior Circuit Judge, and RADER, Circuit Judge.

RADER, Circuit Judge.

The United States District Court for the Southern District of New York awarded Windsurfing International, Inc. lost profits for BIC Leisure Products, Inc.'s infringement of U.S. Reissue Patent No. 31,167.[1] *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.,* 761 F.Supp. 1032, 19 USPQ2d 1922 (S.D.N.Y.1991) (*BIC I*). The court refused to award lost profits for alleged price erosion. *Id.* The district court also refused to award Windsurfing enhanced damages and attorney fees. *Windsurfing Int'l, Inc. v. Fred Ostermann GmbH,* 668 F.Supp. 812, 4 USPQ2d 1429 (S.D.N.Y.1987). Finally, the court granted BIC "absolute" intervening rights. *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.,* 774 F.Supp. 832, 21 USPQ2d 1548 (S.D.N.Y.1991) (*BIC II*).

Assuming BIC had not been in the market, Windsurfing did not show that BIC's customers would have purchased sailboards from Windsurfing and other manufacturers in proportion to their market shares. Therefore, this court reverses the award of lost profits based upon Windsurfing's market share. Otherwise, this court affirms.

### Background

BIC infringed Windsurfing's Reissue Patent No. 31,167, which covers sailboards. Windsurfing seeks damages from BIC for the period from March 8, 1983 (the reissue date of Windsurfing's patent) to September 30, 1985 (the date the district court enjoined BIC from further infringement).

Windsurfing primarily manufactured and marketed sailboards embodying its patented invention for the "One–Design Class." The One–Design Class refers to a uniform competition class as defined by a sailboarding association. A sailboarding association sponsors regattas in which sailboarders compete against each other on boards of uniform weight and shape. Most of Windsurfing's sailboards fit within the weight and shape requirements for the One–Design competition class.

One–Design sailboards lost favor with most sailboarders, however, with the advent of faster, more maneuverable, and more versatile "funboards" and "wave boards." These newer boards had a lighter hull design. Despite the rising popularity of these newer boards in the early 1980s, Windsurfing decided to continue to concentrate on its One–Design boards.

Windsurfing licensed its patented technology extensively. Windsurfing licensed at least twelve companies in Europe. At least one of the European licensees granted sublicenses to other European manufacturers. Windsurfing also granted licenses in the United States. Eventually, Windsurfing licensed twelve companies in the United States. With few exceptions, Windsurfing charged 7.5% of net sales for the U.S. licenses. All of the U.S. licensees, as well as some of the European licensees, competed against Windsurfing in the United States.

Windsurfing manufactured its boards using a rotomolding process. During the early 1980s, many of Windsurfing's competitors reduced their production costs with a new blowmolding process. Instead of switching to the more efficient blowmolding process, Windsurfing invested one million dollars in an unsuccessful attempt to improve its rotomolding process. Windsurfing controlled 29.2% of the sailboard market in 1983, 25.6% in 1984, and 13.6% in 1985.

BIC began selling sailboards in 1981. BIC manufactured with the more efficient blowmolding process. BIC did not sell sailboards with the One Design hull form. Rather, BIC's sailboards differed from Windsurfing's products. BIC instead sold boards at the lower end of the market's price spectrum,

---

1. This court previously affirmed the judgment against BIC for infringement of Windsurfing's patent. *See Windsurfing Int'l, Inc. v. AMF, Inc.,* 782 F.2d 995, 228 USPQ 562 (Fed.Cir.), *cert. denied,* 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986) (*Windsurfing I*).

reflecting its decision to target the entry level segment of the sailboard market.

In comparison, Windsurfing priced its sailboards at the upper end of the sailboard price spectrum. During the years covered by the damages period, U.S. sailboard dealers charged the following average prices:

| 1983 | | 1984 | | 1985 | |
|---|---|---|---|---|---|
| Marker | 837 | Brockhaus | 753 | Mistral | 804 |
| Brockhaus | 753 | Mistral | 741 | Marker | 774 |
| Mistral | 750 | Marker | 674 | Brockhaus | 750 |
| Windsurfing | 670 | SAN/Romney | 623 | SAN | 623 |
| SAN/Romney | 643 | Windsurfing | 589 | Schutz | 575 |
| Alpha | 574 | Schutz | 575 | Windsurfing | 571 |
| Wayler | 550 | HiFly | 527 | HiFly | 570 |
| HiFly | 518 | Wayler | 500 | Wayler | 500 |
| SAN/Schaeffer | 441 | Alpha | 450 | O'Brien | 477 |
| O'Brien | 436 | O'Brien | 412 | Alpha | 450 |
| BIC | 407 | SAN/Schaeffer | 388 | AMF Inc. | 380 |
| AMF Inc. | 377 | AMF Inc. | 384 | BIC | 312 |
| Ten Cate | 366 | BIC | 335 | Ten Cate | 253 |
| AMF Mares | 244 | Ten Cate | 299 | AMF Mares | 244 |
| | | AMF Mares | 234 | | |

The Patent and Trademark Office reissued Windsurfing's patent on March 8, 1983. On that date, BIC had 5,245 sailboards in its inventory and another 5,625 on order. BIC confirmed its purchase of the boards on order with a February 10, 1983 telex.

The district court applied the *Panduit* test to determine whether Windsurfing lost profits. *BIC I*, 761 F.Supp. at 1034. The district court required Windsurfing to show (1) a demand for the patented product, (2) the absence of acceptable noninfringing substitutes, (3) its capacity to exploit the demand, and (4) the profits lost due to the infringement. *See Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir.1978). The district court modified the *Panduit* test by presuming that Windsurfing would have captured a share of BIC's sales in proportion to Windsurfing's share of the sailboard market. *BIC I*, 761 F.Supp. at 1035–37. Relying on *State Industries, Inc. v. Mor–Flo Industries, Inc.*, 883 F.2d 1573, 12 USPQ2d 1026 (Fed.Cir.1989), *cert. denied*, 493 U.S. 1022, 110 S.Ct. 725, 107 L.Ed.2d 744 (1990), the district court awarded Windsurfing lost profits based upon its pro rata percentage of BIC's sales for each year of the damages period. *BIC I*, 761 F.Supp. at 1035–37, 1039. In addition, the district court awarded Windsurfing lost royalties for the boards its licensees would have sold absent BIC's infringement. *Id.*, 761 F.Supp. at 1040. The court calculated the amount of lost royalties based upon a weighted average price of the boards sold by the licensees. *Id.*

The district court permitted BIC to raise a defense of absolute intervening rights at the damages phase of trial. The district court granted BIC intervening rights on its sale of 10,870 boards after the reissue of Windsurfing's patent. *BIC II*, 774 F.Supp. at 837.

*Discussion*

Lost Profits

Section 284 of title 35 provides:

Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement but in no event less than a reasonable royalty for the use made of the invention by the infringer.

■ The finding of the amount of damages for patent infringement is a question of fact on which the patent owner bears the burden of proof. *SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.*, 926 F.2d 1161, 1164, 17 USPQ2d 1922, 1925 (Fed.Cir.1991). Where the district court fixes the amount of

damages, this court reviews that finding under the clearly erroneous standard of Federal Rule of Civil Procedure 52(a). *Id.*

To recover lost profits as opposed to royalties, a patent owner must prove a causal relation between the infringement and its loss of profits. The patent owner must show that "but for" the infringement, it would have made the infringer's sales. *Water Technologies Corp. v. Calco Ltd.*, 850 F.2d 660, 671, 7 USPQ2d 1097, 1106 (Fed. Cir.), *cert. denied*, 488 U.S. 968, 109 S.Ct. 498, 102 L.Ed.2d 534 (1988). An award of lost profits may not be speculative. Rather the patent owner must show a reasonable probability that, absent the infringement, it would have made the infringer's sales. *Id.*, 850 F.2d at 671.

The district court clearly erred by failing to apply the "but for" test before awarding lost profits. The record in this case does not evince a reasonable probability that Windsurfing would have made its pro rata share of BIC's sales had BIC not been in the market. During the period in question, at least fourteen competitors vied for sales in the sailboard market with prices ranging from $234 to $837. BIC's boards sold for $312 to $407; Windsurfing's boards sold for $571 to $670—a difference of over $250 or about 60–80% above BIC's selling range. Because Windsurfing concentrated on the One Design class hull form and BIC did not, Windsurfing's boards differed fundamentally from BIC's boards.

The record contains uncontradicted evidence that demand for sailboards is relatively elastic. The record further contains uncontradicted evidence that the sailboard market's entry level, in which BIC competed, is particularly sensitive to price disparity. By purchasing BIC sailboards, BIC's customers demonstrated a preference for sailboards priced around $350, rather than One–Design boards priced around $600. Therefore, without BIC in the market, BIC's customers would have likely sought boards in the same price range.

Several manufacturers offered sailboards at prices much closer to BIC than to Windsurfing. At least two of Windsurfing's licensees, O'Brien and HiFly, sold boards resembling BIC's in the same distribution channels as BIC. On this record, Windsurfing did not show with reasonable probability that BIC's customers would have purchased from Windsurfing in proportion with Windsurfing's market share. The record shows rather that the vast majority of BIC's customers would have purchased boards from O'Brien or HiFly if BIC's boards had not been available. The district court erred in assuming that, without BIC in the market, its customers would have redistributed their purchases among all the remaining sailboards, including Windsurfing's One Design boards at a price $200 to $300 more than BIC's. *See Water Technologies*, 850 F.2d at 673 (district court erred in awarding lost profits when patent owner's product differed significantly from and cost significantly more than infringer's product); *cf. Dobson v. Dornan*, 118 U.S. 10, 17–18, 6 S.Ct. 946, 949–950, 30 L.Ed. 63 (1886).

Moreover, Windsurfing's sales continued to decline after the district court enjoined BIC's infringement. This aspect of the record shows as well that Windsurfing did not capture its market share of the sales replacing BIC's market sales. According to the record, the principal beneficiary of BIC's exit appears to be O'Brien.

The district court applied the *Panduit* test for lost profits. Properly applied, the *Panduit* test is an acceptable, though not an exclusive, test for determining "but for" causation. *State Indus.*, 883 F.2d at 1577. The *Panduit* test, however, operates under an inherent assumption, not appropriate in this case, that the patent owner and the infringer sell products sufficiently similar to compete against each other in the same market segment. If the patentee's and the infringer's products are not substitutes in a competitive market, *Panduit*'s first two factors do not meet the "but for" test—a prerequisite for lost profits.

The first *Panduit* factor—demand for the patented product—presupposes that demand for the infringer's and patent owner's products is interchangeable. Under this assumption, evidence of sales of the infringing product may suffice to show *Panduit*'s first factor,

"demand for the patented product." *E.g., Gyromat Corp. v. Champion Spark Plug Co.,* 735 F.2d 549, 552, 222 USPQ 4, 6 (Fed.Cir. 1984). This analysis assumes that the patent owner and the infringer sell substantially the same product. In *Gyromat,* for instance, the patent owner's and the infringer's products were similar in price and product characteristics. *Gyromat,* 735 F.2d at 550–51, 553–54. If the products are not sufficiently similar to compete in the same market for the same customers, the infringer's customers would not necessarily transfer their demand to the patent owner's product in the absence of the infringer's product. In such circumstances, as in this case, the first *Panduit* factor does not operate to satisfy the elemental "but for" test.

Similarly, the second *Panduit* factor—absence of acceptable, noninfringing alternatives—presupposes that the patentee and the infringer sell substantially similar products in the same market. To be acceptable to the infringer's customers in an elastic market, the alleged alternative "must not have a disparately higher price than or possess characteristics significantly different from the patented product." *Kaufman Co. v. Lantech, Inc.,* 926 F.2d 1136, 1142, 17 USPQ2d 1828, 1832 (Fed.Cir.1991) (citing *Gyromat,* 735 F.2d at 553). In *Kaufman,* for instance, the patent owner and the infringer sold substantially the same product. *Kaufman,* 926 F.2d at 1143. Thus *Panduit*'s second factor, properly applied, ensures that any proffered alternative competes in the same market for the same customers as the infringer's product. *See Yarway Corp. v. Eur–Control USA, Inc.,* 775 F.2d 268, 276, 227 USPQ 352, 357 (Fed.Cir.1985) (alternative products did not possess features of the patent owner's and the infringer's products, nor compete in the same " 'special niche' or mini-market").

This court has held that a patent owner may satisfy the second *Panduit* element by substituting proof of its market share for proof of the absence of acceptable substitutes. *State Indus.,* 883 F.2d at 1578. This market share approach allows a patentee to recover lost profits, despite the presence of acceptable, noninfringing substitutes, because it nevertheless can prove with reasonable probability sales it would have made "but for" the infringement. Like *Panduit*'s second prong, however, this market share test also assumes that the patent owner and the infringer compete in the same market. In *State Industries,* for instance, the patent owner, infringer, and the other manufacturers sold substantially similar products. *Id.,* 883 F.2d at 1576. This similarity of products is necessary in order for market share proof to show correctly satisfaction of *Panduit*'s second factor.

The assumption underlying *Panduit, Gyromat,* and *State Industries* is not appropriate in this case. Instead, the record reveals that during the damages period the sailboard market was not a unitary market in which every competitor sold substantially the same product. Windsurfing and BIC sold different types of sailboards at different prices to different customers. As noted, their sailboards differed significantly in terms of price, product characteristics, and marketing channels. On the facts of this case, Windsurfing did not show "but for" causation under a correct application of *Panduit* or otherwise. The district court erred in awarding lost profits.

Moreover, Windsurfing itself set the value of its patent rights by licensing its technology to nearly every company supplying sailboards in the United States without competing itself in most sailboard submarkets. Windsurfing valued its patent in terms of licensing royalties, not in terms of profits it could make by excluding others from the market. *See Seymour v. McCormick,* 57 U.S. (How.) 480, 490, 14 L.Ed. 1024 (1854). Without evidence to support Windsurfing's claim to lost profits, this court reverses the district court's award.

With regard to royalties, Windsurfing is entitled to receive lost royalties (on amounts Windsurfing's licensees would have paid "but for" the infringement) and reasonable royalties (on amounts of any other BIC use, if any, of the patented invention). BIC challenges the methodology of the district court in calculating lost royalties per board, but this court concludes that the chosen methodology was within the court's discretion. On remand, the trial court may award damages

based upon the lost royalties per board calculation.

### Price Erosion

■ The district court evaluated the documentary and testimonial evidence on price erosion and found it too speculative to support an award of price erosion lost profits. This court finds nothing clearly erroneous in the district court's finding.

The record shows that other market forces, not BIC, forced Windsurfing to lower its prices. The record is replete with evidence that funboards, wave boards, and other designs replaced One Design boards as the sailboard of choice for many practitioners. Besides reducing the demand for One Design boards, consumer choices also caused many companies to discount their stock of One Design boards to make room for the newer boards.

Furthermore, Windsurfing licensed many competitors who produced boards at less cost. The more efficient blowmolding process allowed Windsurfing's competitors to cut prices. Windsurfing's own licensing policies exacerbated this problem. When the European market peaked in the early 1980s, Windsurfing's European licensees sold their excess inventory in the United States. The influx of European boards increased the supply of sailboards and further reduced prices. In light of these facts, the district court correctly found that Windsurfing failed to meet its burden of proof. Simply put, Windsurfing did not prove that it could have sold its boards at higher prices "but for" BIC's infringement.

### Intervening Rights

■ Windsurfing challenges the district court's recognition of intervening rights as a limitation on damages because BIC did not litigate this issue during the liability phase of this litigation. The accused infringer may raise the defense of intervening rights only when none of the infringed claims of the reissue patent were present in the original patent. 35 U.S.C. § 252 (1988); *Seattle Box Co. v. Indus. Crating & Packing, Inc.*, 731 F.2d 818, 830, 221 USPQ 568, 576 (Fed.Cir. 1984). In this case, none of the reissue claims which BIC infringed were present in Windsurfing's original patent. Therefore, this prerequisite for invoking intervening rights does not bar BIC from raising the defense. This court next examines the other requirements for an intervening rights defense.

The second paragraph of 35 U.S.C. § 252 limits the scope of a reissue patent:

No reissued patent shall abridge or affect the right of any person or his successors in business who made, purchased or used prior to the grant of a reissue anything patented by the reissue patent, to continue the use of, or to sell to others to be used or sold, the specific thing so made, purchased or used, unless the making, using or selling of such thing infringes a valid claim of the reissued patent which was in the original patent. The court before which such matter is in question may provide for the continued manufacture, use or sale of the thing made, purchased or used as specified, or for the manufacture, use or sale of which substantial preparation was made before the grant of the reissue, and it may also provide for the continued practice of any process patented by the reissue, practiced, or for the practice of which substantial preparation was made, prior to the grant of the reissue, to the extent and under such terms as the court deems equitable for the protection of investments made or business commenced before the grant of the reissue.

The second paragraph of section 252 provides for two separate and distinct defenses under the doctrine of intervening rights: "absolute" intervening rights and "equitable" intervening rights. The paragraph consists of two sentences which address two distinct situations and provide two different types of protection. *See* P.J. Federico, *Commentary on the New Patent Act*, 35 U.S.C.A. 1, 46–47 (1954).

■ The first sentence defines "absolute" intervening rights. This sentence provides an accused infringer with the absolute right to use or sell a product that was made, used, or purchased before the grant of the reissue patent as long as this activity does not in-

fringe a claim of the reissue patent that was in the original patent. This right is absolute. In the words of the statute, "[n]o reissue patent *shall* abridge or affect the right of any person." As long as the use or sale of the accused product does not infringe a claim of the reissue patent that also was in the original patent, the owner of the reissued patent has no recourse under the Patent Act.

This absolute right extends only to anything made, purchased, or used before the grant of the reissue patent. In other words, it covers products already made at the time of reissue.

The legislative history of section 252 underscores the meaning of the words in the first sentence:

> The specific things made before the date of reissue, which infringe the new reissue claims, are absolutely free of the reissued patent and may be used or sold after the date of reissue without regard to the patent.

Federico, *Commentary,* 35 U.S.C.A. 1, 46; *see also Spectronics Corp. v. H.B. Fuller Co.,* 940 F.2d 631, 637, 19 USPQ2d 1545, 1550 (Fed.Cir.) (quoting Federico), *cert. denied,* —— U.S. ——, 112 S.Ct. 658, 116 L.Ed.2d 749 (1991).

■ The second sentence of the second paragraph of section 252 defines "equitable" intervening rights. By its terms, this sentence provides for the court to grant much broader rights than does the first sentence. The second sentence permits the continued manufacture, use, or sale of additional products covered by the reissue patent when the defendant made, purchased, or used identical products, or made substantial preparations to make, use, or sell identical products, before the reissue date.

This equitable right is not absolute. The second sentence states: "[t]he court ... *may* provide for the continued manufacture, use or sale ... *to the extent and under such terms as the court deems equitable* for the protection of investments made or business commenced...." 35 U.S.C. § 252 (emphasis added). Thus, under this language, the trial court may, as dictated by the equities, pro-

tect investments made before reissue. Again, the legislative history reinforces the meaning of the statutory language. *See* Federico, *Commentary,* 35 U.S.C.A. 1, 46–47.

■ In the previous interlocutory appeal, AMF, a defendant which has since settled with Windsurfing, challenged the district court's liability holding and injunction. It argued that the district court did not consider its defense of intervening rights. This court ruled that AMF had abandoned, during the trial on liability, the defense of intervening rights. This court did not distinguish, however, between equitable and absolute intervening rights. On remand, the district court ruled that AMF had abandoned only the defense of equitable intervening rights by which AMF sought the right to continue to manufacture infringing sailboards.[2] The district court further ruled that neither AMF nor BIC had waived the defense of absolute intervening rights. The district court reasoned as follows:

> AMF properly waited to assert this defense until the damage phase of this bifurcated action, because the effect of the defense, if established, will be to reduce the amount of damages which AMF must pay.

*Windsurfing Int'l, Inc. v. Fred Ostermann GmbH,* 655 F.Supp. 408, 410, 2 USPQ2d 1318, 1319 (S.D.N.Y.1987). This court agrees that BIC properly raised its defense of absolute intervening rights during the damages trial. BIC's absolute intervening rights defense addresses a damages issue—the identification of those sales of BIC sailboards that properly serve as a measure of Windsurfing's damages. Thus, the absolute intervening rights defense did not become an issue until Windsurfing secured a liability judgment against BIC.

Although BIC did not plead its absolute intervening rights defense, the district court properly admitted BIC's intervening rights evidence under Federal Rule of Civil Procedure 15(b). Rule 15(b) provides in part:

> If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall

---

2. On remand, BIC conceded it had waived equitable intervening rights.

do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that admission of such evidence would prejudice the party.

.    .    .    .    .

In such situations, however, failure actually to amend the pleading "does not affect the result of the trial of these issues." *Id.* The district court found that BIC provided Windsurfing with ample notice of its intent to prove intervening rights. *BIC II,* 774 F.Supp. at 835–36. The trial court also found that Windsurfing was fully aware of BIC's position through its deposition of BIC's intervening rights witness. *Id.* The court further found that this notice prevented any prejudice to Windsurfing by the presentation of BIC's intervening rights evidence. Finally, the district court found that BIC's intervening rights defense was an important part of the merits of the action within the above rule. Windsurfing challenges none of these findings. The district court committed no error in considering BIC's absolute intervening rights defense.

This court's *Windsurfing I* opinion, 782 F.2d at 1002–03, did not preclude, under the doctrine of law of the case, the district court from considering BIC's defense. The doctrine of law of the case "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case." *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 816, 108 S.Ct. 2166, 2177, 100 L.Ed.2d 811 (1988) (quoting *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983).

In *Windsurfing I,* the court was presented only with the issue of AMF's waiver of an equitable intervening rights defense to the injunction. AMF asserted an equitable intervening rights defense under the second sentence of the section 252's second paragraph. AMF belatedly sought to introduce evidence to support its contention that it should not be enjoined from the continued

manufacture of sailboards because it had made substantial investments before reissue. Thus, *Windsurfing I* addressed an issue, whether equitable intervening rights precluded the injunction, not present in this case. Accordingly, *Windsurfing I* does not govern BIC's absolute intervening rights defense.[3]

■■■ Therefore, this court sustains the district court's ruling that BIC established an absolute intervening rights defense to damages on 10,870 sailboards. BIC had 5,245 boards in inventory as of the reissue date. The district court found that BIC had another 5,625 boards on order. Specifically, the district court found that the telex purchase order, dated February 10, 1983, between BIC and an affiliated supplier, BIC Marine, bound BIC to purchase the sailboards. This court discerns no error in the trial court's determination that these sailboards were purchased within the meaning of section 252 before the critical date of March 8, 1983. Because BIC purchased the boards before the reissue date, the district court properly excluded the post-reissue sale of the 10,870 sailboards from the computation of damages.

### Willful Infringement and Enhanced Damages

The patent statute authorizes courts to award increased damages. 35 U.S.C. § 284 (1988). A court may award enhanced damages under this section upon a finding of willful infringement. *Avia Group Int'l, Inc. v. L.A. Gear California, Inc.,* 853 F.2d 1557, 1566, 7 USPQ2d 1548 (Fed.Cir.1988). In "exceptional cases" the district court may award attorney fees to the prevailing party. 35 U.S.C. § 285 (1988). Both willfulness and exceptionality are questions of fact that this court reviews under the clearly erroneous standard. *See State Indus.,* 883 F.2d at 1581; *Fromson v. Western Litho Plate & Supply Co.,* 853 F.2d 1568, 1573, 7 USPQ2d 1606, 1611 (Fed.Cir.1988). Windsurfing had the burden of proving by clear and convincing evidence that BIC's infringement was willful and that the case was exceptional.

---

**3.** Furthermore, in *Windsurfing I,* this court did not limit the district court's discretion to determine when an absolute intervening rights defense may be tried. This court merely held that

the district court was under no obligation to consider a defense which under the facts of that case AMF had abandoned during the liability trial. *Windsurfing I,* 782 F.2d at 1003.

State Indus., 883 F.2d at 1581; *Badalamenti v. Dunham's, Inc.,* 896 F.2d 1359, 1364, 13 USPQ2d 1967, 1972 (Fed.Cir.), *cert. denied sub. nom., Hyde Athletic Indus., Inc. v. Badalamenti,* 498 U.S. 851, 111 S.Ct. 142, 112 L.Ed.2d 109 (1990).

 After reviewing the record, this court finds no clear error in the district court's findings of nonwillfulness and nonexceptionality. The record shows that BIC had a good faith basis for its belief that Windsurfing's reissue patent was invalid. BIC received both oral and written opinions from patent attorney Mesorole advising to that effect. The district court specifically found that Mr. Mesorole was "competent and experienced in patent matters" and "intimately knowledgeable as to both the history of the [Windsurfing] patent proceedings and the legal issues involved." And, although it had no bearing on validity proceedings in this country, the invalidation of Windsurfing's British patent served to strengthen further BIC's belief that the claimed invention was obvious in light of prior art. Moreover, as the district court correctly found, Windsurfing produced no evidence of direct copying. The district court's determination that Windsurfing did not show willfulness was not clearly erroneous.

The district court conducted a separate, three-day trial on the issues of enhanced damages and attorney fees. The trial court carefully weighed the testimony of six witnesses and hundreds of documents. This court discerns no reason to overturn the district court's decision. For the same reasons, this court finds no error in the district court's denial of attorney fees.

### Conclusion

For the reasons stated above, the judgment of the district court is affirmed-in-part, reversed-in-part and remanded for recalculation of royalty damages in accordance with this opinion.

### Costs

Each party to bear its own costs.

AFFIRMED–IN–PART, REVERSED–IN–PART, and REMANDED